Matter of the Probate of the Last Will and Testament
of PETER B. MOYER, Deceased.

(Surrogate's Court, Montgomery County, November, 1916.)

Wills — probate of — when testator possessed of sufficient mental
capacity — executors and administrators — undue influence — evi-
dence — witnesses.

The law permits a person to dispose of his property at
pleasure and,. so long as testator was possessed of sufficient
mental capacity and observed in the execution of his last will
the required legal formalities and acted freely, his wishes must
be respected, and the will given effect regardless of the con-
trary. wishes of his heirs at law and next of kin or beneficiaries
respecting his property.

Where shortly after the commencement of a proceeding for
the probate of a last will each adult heir and next of kin of
testator and the general guardian of an infant interested in
the estate and a legatee requested the executor named in said
will to offer no more than formal proof of the subscribing
witnesses and not to oppose the probate of an earlier will,
which had been offered for probate, expressing it to be their
desire that it be admitted to probate, no consideration can

be given to such wishes, and where it appears that testator, an old man who had lost much of his physical and mental strength, on the day of the execution of the later will, went unaccompanied to the office of an attorney who had known him for thirty-five years and who drew the will, and, considering its terms, no doubt dictated, signed and executed it, and the court must find from the testimony that testator at the execution of said instrument was possessed of sufficient mental capacity to make and execute a valid will and that he was at the time under no undue influence or restraint, a decree for the probate of the later will should be granted, there being but a slight difference in the testamentary provisions of both instruments.

Where relying wholly and only upon the testimony of lay and medical witnesses and disregarding entirely the testimony of the subscribing witnesses a doubt as to the competency or incompetency of testator is equally balanced, there is to be added to the scale the natural weight of the presumption of sanity and further weight must be given to the fact that less mental faculty is required to make a will than any other legal instrument.

PROCEEDING upon the probate of a last will and testament.

Henry M. Eldredge (Fox Sponable, of counsel), for proponent.

Walts & Young, for contestants.

Charles E. Hardies, special guardian for Clara Pearl Bleekman, a minor.

MYERS, S. Peter B. Moyer died in the town of Minden on March 16, 1916, at the age of eighty-two years. He had been twice married but left no widow, his second wife having died upwards of sixteen years previous thereto. He left surviving him as his only heirs-at-law and next of kin Nathaniel O. Bleekman, George M. Bleekman, Helen Ethel Bleekman Bailey and Clara

33

Pearl Bleekman, his grandchildren, they being children of a deceased daughter by his first marriage, all being of full age except the last named who is a minor upwards of seventeen years of age.

On March 27, 1916, there was filed for probate an instrument, bearing date January 26, 1914, purporting to be his last will and testament, which instrument was drawn by Harry D. Walts, a nephew of the deceased, and witnessed by said Walts and his law partner, Samuel L. Young. One Charles W. Bowers was named therein as executor. This instrument directs disposition of decedent's property as follows: Household furniture and goods to said grandchildren and the rest, residue and remainder, including real and personal, to said grandchildren and one John W. Van Auken, a son of decedent's first wife, share and share alike; authorizes and empowers his executor to sell and convey real estate.

This will further provides that said legatees or the wife or husband of either shall not present any bill, claim or demand against his estate except promissory notes, or other obligations, given under his hand, and, in case said persons should present such claim, that the devise or legacy to such person should be forfeited to the other devisees or legatees.

Thereafter and on the 12th day of April, 1916, there was filed for probate an instrument bearing date January 5, 1916, purporting to be the last will and testament of said deceased. This instrument was drawn by Henry M. Eldredge, an attorney, and was witnessed by said Eldredge and one Elfonzo Green. One Frank W. Bauder, a nephew of decedent's first wife, was named therein as executor. This instrument directs the disposition of decedent's property as follows: " Unto my grandchildren, the children of my daughter Clara, all of my property, both real and personal,

which I now have or may have at the time of my death; except that I will, devise and bequeath to John Van Auken, the one-tenth part of the residue of my estate.'' He authorizes, empowers and directs his executor to sell any and all real estate.  No provision is made in this instrument regarding the presentation of claims by any legatee or devisee.

Objections to the probate of the last named will were filed by Nathaniel O. Bleekman, Jr., George M. Bleekman, Helen Ethel Bleekman Bailey, said grandchildren, and John Van Auken, the legatee named therein, through Walts & Young, their attorneys, who were also the attorneys representing the executor in filing the first named will for probate.

Upon the written application of Clara Pearl Bleekman, a minor grandchild, Charles F. Hardies, Esq., was appointed her special guardian to appear for and represent and protect her interests in the pending proceedings.

Shortly after the commencement of the proceeding for the probate of the last named instrument, there was served upon the executor named therein a written request signed by each adult heir and next of kin and by the general guardian of the said minor, and also by the said John Van Auken, requesting that said executor offer no more than formal proof of the subscribing witnesses to substantiate said last named instrument, requesting him further not to oppose the probate of the first mentioned will and expressing it to be their desire that the first named instrument be admitted to probate.

This case presents a novel situation, that of the heirs at law and next of kin opposing probate of the instrument which, according to its terms, appears to be most favorable to them and asking that a prior instrument, under which it appears they would receive less of

decedent's estate, be admitted to probate. On the trial of the issues raised, the special guardian, following the apparent wishes of his ward, joined with the contestants in opposing the will under consideration and conducted the examination of the witnesses produced and made the oral argument before this court on behalf of all of the contestants, the record accordingly making it appear that the minor, after all, was the active contestant.

If I could consider first and only the wishes of all of the parties directly interested herein, I would be inclined to accede to their wishes and deny probate of the instrument against which they have opposition, and admit the prior instrument. The law, however, gives to every person a right to dispose of his property in any manner that best suits him, and, so long as he was possessed of sufficient mental capacity and observed in the execution of the instrument the required legal formality and acted freely, it is his wishes which must be respected, and his testamentary disposition given effect, regardless of the contrary wishes of his heirs at law and next of kin or beneficiaries respecting his property. *Dobie* v. *Armstrong,* 160 N. Y. 584; *Smith* v. *Keller,* 205 id. 39; *Morton's Estate,* 219 id. 355.

Recognizing my duty to be to consider first and only the will of the decedent and see that the same prevails, I must eliminate entirely from any consideration herein the wishes of the contestants and direct my attention only to the questions of fact presented by the evidence and to applying the law governing in such cases. In view of the slight difference in the testamentary provisions of the two instruments mentioned, and of the fact that all of the parties directly interested are so completely in harmony as to the manner in which they would distribute the decedent's estate, and having

knowledge of the fact, as well, that the executor under
the will opposed felt it his duty to endeavor to estab-
lish its validity and see that the decedent's wishes as
therein expressed were fulfilled, I cannot refrain, in
passing, from expressing it to be my opinion that the
trouble and the expense to which the parties in interest
have been put in this contest were hardly warranted.

The objections filed raised the issue of due execution
of the instrument and that of undue influence as well
as that of testamentary capacity, yet no testimony was
presented by contestants directed to the first named
issues, and from all the evidence presented I am satis-
fied that the instrument was signed, sealed, published
and declared by the deceased in conformity with the
requirements prescribed by statute, and that he was at
the time under no undue influence or under any
restraint, and so find.

There is left for further consideration the only
remaining issue, that of testamentary capacity of the
deceased at the time of the execution of such instru-
ment. It appears from the evidence that decedent's
property at the time of his death aggregated, in all,
approximately, $12,000 to $14,000 against which there
were debts of approximately $6,500; that such prop-
erty consisted of some personal property and a farm
of about 150 acres, a wood lot, and a small place of
about twelve acres with a residence thereon, occupied
by John Van Auken and his family with whom the
decedent lived and had for a number of years; that
since December 5, 1914, decedent had not managed or
looked after such property personally, except to collect
and receive the rental of $3 per month from the build-
ing occupied by a grange; that on said December
fifth he executed a general power of attorney to Walts
& Young, under which they managed the affairs con-
nected with said farm, collecting the income therefrom

and paying obligations from time to time and giving him small sums of money on a few occasions.

Many witnesses were produced and examined on the part of the contestants, some of whom were wholly disinterested and others were members of the family of John Van Auken. From the evidence of such witnesses it would appear that decedent, during the last two years of his life, had a defective memory, complaining at times, himself, thereof and often complaining that he was not competent to do business, complaining about his head in connection therewith; that he did many things that impressed such witnesses as being irrational and which to the average individual might appear to have been irrational and the acts of a person of unsound mind; that during the last year of his life he did not talk much, often sitting about the house saying little and acting in a way which impressed the witnesses as being irrational; that he was careless about his person and clothing and did many things which showed the loss of ethical feelings and the ascendency of the grosser instincts; was uncleanly in his habits and dress. As to his physical condition and appearance, he was described as being stooped in figure, walking with a shambling gait, tongue hung out of his mouth, and drooled at the mouth, and at times it was hard to understand him.

The physician who attended him from time to time from May, 1914, until his death, described his physical and mental condition and said his physical condition was that of a senile individual, decrepit and showed considerable evidence of general physical weakness, and that physically and mentally he was gradually growing weaker from June, 1915, to the time of his death; that he was suffering from chronic Bright's disease, hardening of the arteries and chronic valvular heart disease. He said decedent called at his office on

occasions during said period, having made two calls in January, 1916, unaccompanied by any person, and answered questions put to him.  On cross-examination, he said a few of the decedent's actions were rational and a good many were irrational; that in his talk with decedent in January, 1916, he did not remember what was said but that decedent answered questions put to him and that he did not recall anything that indicated on such visits one way or another as to rationality; that there was nothing irrational in his answers to questions.  He gave the cause of death to be from the final stage of Bright's disease — uremic coma.

Another physician examined as an expert on the part of the contestants, testifying upon a hypothetical question propounded, gave his opinion that decedent was insane.

On the part of the proponents several persons who had known decedent for many years of his life testified to meeting him from time to time during the last two years and to conversations had with him and his conduct and appearance, giving their opinion that his conversation and conduct impressed them as being rational; that his clothing did not appear dirty, tongue did not hang out; that he did not drool at the mouth, and that his conversation could be easily understood. From all of the testimony it appears that decedent, with the exception of a couple of periods of sickness for a short time, on each occasion, was up and out and around, visiting Fort Plain frequently, going to the offices of Walts & Young, visiting his doctor's office, meeting, recognizing and greeting acquaintances, taking his dinners when at Fort Plain at a hotel, paying his bill thereat and transacting some minor personal business.  Two doctors were also examined on the part of the proponent, who testified and gave

opinions based upon hypothetical questions propounded to them. In considering the testimony of the witnesses on the part of both sides, due weight has been given thereto, taking into consideration the opportunity to meet and observe the decedent and his conduct, and the ability of such persons to judge as to rationality, as well as the interest which any such person may have had in the outcome of this proceeding. The testimony of the attending physician and experts has been considered fully and given such weight as, in my opinion, it deserved.

*Senile dementia* is defined to be that peculiar decay of the mental faculties which occurs in extreme old age, whereby the person afflicted is reduced to second childhood. I think there can be no doubt but that the decedent was afflicted with senile dementia in some stage of its progress on January 5, 1916, but whether it had reached that last stage wherein he might, by reason thereof, have become wholly incompetent to enter into a binding contract or even to execute a will, is a more serious question. If I should rely wholly and only upon the testimony of the lay and medical witnesses and disregard entirely the testimony of the subscribing witnesses, I would entertain a doubt as to the question of his testamentary capacity, and such a doubt as would make this case, no doubt, one where there should be no straining after probate. In the case of *Miller* v. *White,* 5 Redf. 320, however, the learned surrogate held on the issue of sanity: "If upon the whole case the fact remains doubtful, the will cannot be rejected." This rule is sound, to my mind, where the doubt existing is equally balanced as to competency or incompetency of the alleged testator, for in such cases there must be added to the scale by which the question is weighed the natural weight of the presumption of sanity. In this connection further

weight must also be given to the fact that less mental
faculty is required to execute a will than to enter into
any other legal instrument, the fixed rule being that to
have capacity to make a will a person must be capable
of comprehending the condition of his property and
of his relations to those who are the natural objects of
his bounty, to collect and retain in mind, without
prompting, the elements of the business he is then
transacting and hold them there until their relation to
each other can be perceived and rational judgment in
respect thereto be formed. This test as to competency
applies at the very time of the execution of the will.

The statute provides that a will to be valid and
entitled to be admitted to probate must be executed
in the presence of at least two persons who shall be
selected by the testator and by him requested to be
subscribing witnesses thereto, and that they shall sub-
scribe the instrument as such, in his presence, after
hearing him declare such instrument to be his last will
and testament. This provision, required to be followed
with such detail, is not only to prevent fraud and the
exercise of undue influence, but for the further and as
important purpose of having present at the time of the
act of execution persons of the testator's own selec-
tion who can testify as to his mental condition as of
that time. That the court, which may be called upon
to pass upon the competency of the testator, may not
have to depend largely or only upon a recital of con-
versations with and description of conduct by, nor
the opinions of persons who may be produced by either
side to a controversy over the question, many of whom
may, through interest in behalf of the side by which
they are examined, be biased; or be unable from lack
of proper opportunity to observe or of ability to give
a reliable opinion at or about the time of the execution
of the instrument in question, the rules of evidence

Surrogate's Court, Montgomery County, November, 1916. [Vol. 97.

permit subscribing witnesses to a will to be asked the direct question regarding, and to give an opinion as to the competency of the alleged testator to make a will. Therefore the court may, and in fact is required to, look to such subscribing witnesses for the most trustworthy source of information regarding the then mental condition of the testator, and accordingly should give it greater weight than the testimony of such other lay witnesses, and often, as well, greater weight than that of the expert witnesses who cannot always be said to be unbiased in the giving of their opinions.

Another reliable source of evidence, and one that must be taken into consideration in connection with the evidence of all of the witnesses, is that furnished by the testamentary provisions of the instrument in question, considering in connection therewith the persons who were the natural objects of the testator's bounty. Turning for a moment to a consideration of the circumstances connected with its making and execution and to the provisions of the instrument in question, it cannot be said that its terms are the product of any mind other than that of the testator, nor can it be said the attempted disposition of his property was such an unusual or unnatural testamentary disposition as to raise a suspicion that testator was of unsound mind, particularly as to its provisions, when a comparison is made with the terms of the prior alleged will. It appears that decedent, referring to said prior will, stated that he wanted to make a change therein, not being satisfied with it, and that he also gave certain other reasons why he wanted to make a new will. Whether the reasons given were sound or not is of no import, so far as the act in making the will, itself, is concerned, and there is no satisfactory evidence to warrant a finding that he was at the time lab-

oring under any delusions which entered into the tes-
tamentary disposition of his property thereunder. ·

Coming now to the day and time of the execution of·
the instrument in question and considering, finally, the
evidence furnished by the testimony of the subscribing
witnesses on the question of testamentary capacity, it
appears that the attorney who attended to the prepa-
ration and execution of the instrument had known
decedent for thirty-five years, had met him frequently,
and that on two occasions prior to the execution of
said instrument he had called at his office and talked
about making a new will, saying that he wanted him
to draw his will for him.  Said attorney testified that
being busy with other papers at the time he told him
to come again if he wanted his will drawn, and that on
the 5th day of January, 1916, he did call again at his
office, unaccompanied by any person, and asked him if
he was then ready to draw his will, to which he replied
that he was and asked him to sit down and wait until
he had finished some other work upon which he was
then engaged.  Further, that at the time there were in
his office one Elfonzo Green and one Howard Kearns,
the latter being an occupant of said office and doing
clerical work for said attorney, and one Frank Parks.
Further, that when he finished his work, he told Mr.·
Moyer that he was ready to draw his will and asked
him how he wanted it, to which he replied that he
wanted to leave his property to his grandchildren, all
but one-tenth part thereof that he wanted to give to
John Van Auken.  Being asked to give the names of
his grandchildren, he did so, saying they were children
of his daughter Clara, and saying further, "It isn't
necessary to put the names down," to which the attor-
ney replied, "I don't think it is, myself;" that in
preparing the will and coming to the name of John Van·
Auken, said Kearns, who was operating the type-

Surrogate's Court, Montgomery County, November, 1916. [Vol. 97.

writer, asked how to spell the name of "Van Auken," and the attorney thereupon turned to decedent and asked him how to spell said name, to which he replied "Van Auken." Coming to the point of naming an executor, that he was asked whom he wanted and he replied "Frank Bauder;" that when said will was prepared, it was read over to decedent and he was asked whom he wanted for witnesses and he replied that he wanted said attorney and Mr. Green, who were present; that thereupon he signed the will in the presence of such persons as witnesses and they thereupon signed in his presence. Elfonzo Green, the other subscribing witness, appears to have known decedent for about thirty-five years and to have met him from time to time and conversed with him. He testified to practically the same essential details, and further that, while decedent was waiting for Mr. Eldridge to draw the will, he, decedent, talked with him about his farm and about raising crops thereon and that he told him who worked the farm and how many cows he had on it. Each of said witnesses testified that in his opinion the decedent was on such day and at such time competent to make a last will and testament. Howard Kearns, who prepared said instrument on the typewriter, testified to the same essential facts. One Frank Parks, who appears to have been in the office, testified to overhearing much of the same things testified to by said three witnesses.

There is no doubt as to the fact that decedent was an old man who had lost much of his physical and mental strength. And neither can there be any doubt as to the fact that decedent did visit the office of Mr. Eldridge on the 5th day of January, 1916, unaccompanied by any person, and, considering the terms of the instrument in question, no doubt that he did dictate such terms and did sign and execute the instrument. I am

not warranted in disregarding, or failing to give due weight to the testimony of the subscribing witnesses, and, unless I should wholly disregard such testimony and rely only and entirely upon the evidence of the other witnesses, I must find that testator, on the day and at the time of the execution of said instrument, was possessed of sufficient mental capacity to make and execute a valid will. Taking into consideration all of the evidence before me, I do find and decide that Peter B. Moyer was, at the time of executing the instrument in question, possessed of sufficient mind and memory to make a valid will, and that the will bearing date January 5, 1916, should be admitted to probate as a will valid to pass real and personal property. A decree will be granted accordingly.

Probate decreed.